* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On August 11, 2002, and all times thereafter, the parties were bound by and subject to the North Carolina Workers' Compensation Act.
2. On August 11, 2002, and at all times thereafter an employee-employer relationship existed between plaintiff and defendant.
3. On August 11, 2002, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant.
4. On August 11, 2002, plaintiff's average weekly wage was $ 374.71.
5. Plaintiff continued to work for defendant up to and including November 21, 2003.
6. Plaintiff has not returned to work nor has he received any workers' compensation payments or wages since November 21, 2003.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff's date of birth is December 29, 1947 and he is 59 years of age. Plaintiff completed the eighth grade at night school in New Jersey when he was twenty-one years old. He has no other education or formal training.
2. Plaintiff worked for defendant for approximately thirteen years prior to the August 11, 2002 accident. He worked for approximately ten years at defendant's location on Brevard Road in Asheville, North Carolina, and approximately three years at defendant's location in Mooresville, North Carolina. Prior to his work for defendant, plaintiff worked in a textile mill as a general helper feeding yarn to a machine for approximately five years and as a general laborer in a furniture factory.
3. Plaintiff's job duties for defendant were varied and included retrieving shipping carts or buggies from outside the store, unloading trucks with load weights of 25-200 pounds, retrieving items from an upstairs storage area and carrying out to customers' cars merchandise ranging in weight from 25-200 pounds, hanging signs inside the store with the use of a ladder, taking out and emptying large trash cans weighing 50-75 pounds, and general cleaning, such as cleaning the bathrooms, and maintenance work. When he had to lift heavy items, he sometimes received assistance.
4. On August 11, 2002 plaintiff was sent to the upstairs storage room of defendant's store to retrieve a box of patio furniture. The box containing the patio chairs weighed approximately 150 pounds. Plaintiff was in the process of moving the box down the stairs by pulling/dragging the box, and when he reached the third step he lost control of the box and fell down the remaining seven steps, landing on his back and buttocks. He felt immediate pain in his lower back.
5. Plaintiff reported the accident immediately to Jackie Putnam, the Human Resources manager for defendant. Ms. Putnam was in her office, which was near the steps, and was aware that plaintiff had just fallen. She asked plaintiff if he was all right and later filed an accident report.
6. Plaintiff worked the remainder of the day, was off work the next day, and returned to work on Monday August 13, 2002. At that time, plaintiff requested that an appointment with a doctor be scheduled for him due to increasing back pain. Jackie Putnam scheduled an appointment for him at Sisters of Mercy Urgent Care on August 15, 2002.
7. Plaintiff attended the appointment on August 15, 2002. He was assessed with low back pain, and prescribed medications including Skelaxin and Vioxx. Plaintiff was placed on limited duty from August 15 through August 22, with no lifting over ten pounds, no heavy pushing, pulling or lifting, no stair climbing and it was noted that the medication may cause drowsiness. It was the opinion of the treating physician that the injury was work related.
8. Plaintiff continued to work with these restrictions from August 15, 2002 until August 29, 2002 when he returned to Sisters of Mercy. He was again diagnosed with low back pain/strain. His medications were continued and his restrictions more defined to no lifting over twenty-five (25) pounds and no heavy pushing, pulling or lifting.
9. Plaintiff continued working after the August 29, 2002 visit to Sisters of Mercy doing his usual duties except that he had help with heavy lifting. He continued to experience pain in his lower back especially with lifting. He returned to Sisters of Mercy on September 10, 2002 and at that time, he was released to full duty. Plaintiff continued to work doing his usual duties after September 10, 2002 until March 20, 2003.
10. Plaintiff periodically complained to Jackie Putnam that he continued to experience back pain. In early March 2003, he became more persistent and requested another appointment to see a doctor. Jackie Putnam scheduled an appointment with Dr. Andrew Rudins.
11. Dr. Rudins is a physical medicine and rehabilitation specialist. At his first visit on March 20, 2003, plaintiff reported to Dr. Rudins that he was doing reasonably well working full duty, but he was also continuing to experience back pain. Dr. Rudins diagnosed lumbrosacral sprain with underlying degenerative disc disease. He also noted an apparent compression fracture at L4. Dr. Rudins ordered a lumbar MRI, which was done on July 31, 2003. Dr. Rudins recommended physical therapy, and prescribed Vioxx.
12. Plaintiff returned to see Dr. Rudins on July 28, 2003 and August 1, 2003. Dr. Rudins noted no major changes, but that plaintiff appeared to be worse symptomatically. On August 1, 2003, Dr. Rudins reviewed the MRI scan of plaintiff's lumbar spine, which showed multilevel degenerative changes with a grade 1 spondylolisthesis at L3 and L 4, resulting in moderately severe spinal stenosis at that level. The scan also showed some diffuse bulging at L4-5 and L5-S1. Dr. Rudins found no evidence of a compression fracture or any acute injury on this MRI, done almost a year after the plaintiff's accident. However, he did note an irregularity at L4, which he described as possibly related to a "Schmorl's node."
13. Pursuant to Dr. Rudin's instructions, plaintiff participated in physical therapy three times per week from August 2, 2003 through October 10, 2003. During this time, he continued to work for defendant with a reduction in his carrying and lifting responsibilities.
14. Plaintiff returned to see Dr. Rudins on October 15, 2003 and reported that he was still having pain across the back, particularly worse after eight hours of work. Plaintiff indicated that he was not performing as much lifting and carrying as did before, but was still doing a fair amount. Dr. Rudins noted that he did not foresee plaintiff being able to perform this job in the long term. Plaintiff agreed to undergo a lumbar epidural.
15. Plaintiff continued to work for the employer through the end of his regular shift on Friday, November 21, 2003. Plaintiff's back hurt all that day and became progressively worse throughout the workday. Thereafter, plaintiff traveled to Newport, Tennessee for the Thanksgiving holiday to visit with his mother. While visiting his mother, plaintiff experienced a flare-up of his low back pain. Consequently, plaintiff presented to an emergency room in Cocke County, Tennessee on November 24, 2003. He was prescribed pain medicines and told to stay out of work until he could follow-up with Dr. Rudins.
16. The following Monday, plaintiff called Jackie Putnam and reported that he had been to the hospital with his back and would be unable to work.
17. On December 1, 2003 plaintiff returned to Dr. Rudins and reported that he had a significant flare-up in the last week or so. Plaintiff told Dr. Rudins that he last worked the Friday before Thanksgiving and that he had increased pain across the lumbar region, and a bad headache that Friday evening. Plaintiff also indicated that he had pain down both legs, predominantly on the right, with some associated numbness and tingling. Dr. Rudins' diagnosis of the underlying condition remained the same, but he noted this was a flare-up of plaintiff's symptoms.
18. Dr. Rudins was of the opinion that plaintiff's flare-up in symptoms was most likely related to his work activities, in which he was required to do bending, twisting and heavy lifting. Dr. Rudins restricted plaintiff from resuming his usual duties and restricted his work to light duty with maximum lifting of 15 pounds, with no bending or twisting.
19. Plaintiff underwent an independent medical evaluation by Dr. Stewart J. Harley on April 19, 2004. Dr. Harley examined plaintiff and reviewed plaintiff's x-rays done August 15, 2002. Dr. Harley's assessment was that the x-rays showed a compression fracture at L4 of approximately 10-15 percent. Dr. Harley also reviewed the MRI done July 31, 2003, and noted that it did not clearly suggest acute compression fracture. However, in Dr. Harley's opinion this was not unusual since the MRI was done almost a year after the injury. He did not agree with Dr. Rudins that the irregularity at L4 had the appearance of a Schmorl's node.
20. Dr. Harley's diagnosed plaintiff as having sustained a compression fracture of L4, which Dr. Harley related to plaintiff's falling down the stairs while working for defendant on August 2002. He also diagnosed plaintiff with severe degenerative changes in the lumbar spine, especially at L3-4 and L4-5 with very severe stenosis, lateral recess and nerve root impingement at L3-4, and moderate lateral recess stenosis at L4-5.
21. Dr. Harley determined that plaintiff was at maximum medical improvement from the compression fracture with a seven percent permanent impairment to his back. He believed that plaintiff's symptoms were coming from his arthritis and degenerative disc disease. However, he also formed an opinion that plaintiff could not do any heavy work with his spine in that condition, and that he would be restricted to a job which required no bending and lifting no more than five pounds.
22. On January 20, 2004 Ms. Kathy Keesee, a lost time adjuster for Cambridge Integrated Services Group, Inc, wrote a letter to Dr. Rudins inquiring as to plaintiff's status. In that letter she stated that plaintiff had been ". . . placed on restrictions such that the employer can not accommodate." Shortly after the December 1, 2003 visit to Dr. Rudins, plaintiff called Jackie Putnam and told her about the restrictions. Ms. Putnam informed plaintiff that there was no light-duty work available.
23. Dr. Rudins testified and the Full Commission finds as fact, that based on the letter from Kathy Keesee dated January 20, 2004, and the job description he was provided of plaintiff's regular job, plaintiff could not perform his regular job. Dr. Rudins sent a letter dated February 5, 2004 to Ms. Keese advising her that the plaintiff's injury at work caused plaintiff's degenerative disc disease to be symptomatic.
24. The medical evidence establishes that plaintiff sustained a compression fracture of L4, as shown on the initial x-rays and as by opined by Dr. Harley, as a consequence of his fall down the stairs on August 11, 2002. The fracture was not so apparent on the MRI from a year later, and reviewed by Dr. Rudins. As shown further by Dr. Rudins testimony and his medical notes and correspondence, the fall aggravated plaintiff's pre-existing underlying degenerative disc disease and spinal stenosis, such that these conditions became symptomatic.
25. At some point in late December of 2003 or early January of 2004 the plaintiff was offered a "tagging job" by Jackie Putnam over the telephone. Plaintiff testified that he had worked at this same store for ten years and knew of no job that consisted only of tagging. He had on prior occasions asked the manager of the store about advancement or a better job and was told that he did not have enough schooling.
26. With regard to the "tagging job," Ms. Putnam testified that she had offered the job to plaintiff and he indicated that he could not do the job due to back pain and inability to sit or stand. She stated that the lady currently performing the job was like everyone else in the store, they unload the trucks when they come in and unloading trucks would involve lifting and carrying merchandise. However, the job would have been modified to eliminate any lifting at all for plaintiff. This proposed "tagging job" was not referred to or mentioned in Ms. Keesee's letter to Dr. Rudins on January 20, 2004.
27. Plaintiff continued to see Dr. Rudins on July 8, 2004, August 10, 2004, November 11, 2004, and December 21, 2004. On December 21, 2004, Dr. Rudins scheduled a Functional Capacity Evaluation (FCE) for plaintiff. He noted that plaintiff would need long-term follow-up in regard to pain management.
28. On January 11, 2005, the FCE was performed by Douglas Scarborough at Spine Carolina. Prior to the FCE on January 11, 2005 defendant had assigned Ms. Eve Lape, RN to plaintiff's case as a Nurse Case Manager. In anticipation of the FCE Ms. Lape contacted Ms. Jackie Putnam, the Human Resources manager for defendant on January 10, 2005 and interviewed Ms. Putnam with regard to plaintiff's job responsibilities. Based on the information received from Ms. Putnam, Ms. Lape formulated a handwritten job description for plaintiff's work duties for defendant. Ms. Lape faxed the job description to Douglas Scarborough on January 11, 2005 the date of the FCE.
29. During the FCE of Jan. 11, 2005, plaintiff displayed submaximal effort and symptom magnification. Despite questionable results of the test, plaintiff's FCE demonstrated he was capable of performing work in the sedentary to light category.
30. On January 20, 2005 plaintiff returned to see Dr. Rudins for final restrictions, determination of maximum medical improvement and rating. Dr. Rudins reviewed the handwritten job description dated January 10, 2005 and concluded that plaintiff's job with defendant was at least medium-duty capacity. It was his opinion that plaintiff could not perform this job. Dr. Rudins assessed plaintiff with a five (5) percent permanent impairment rating to his back and placed permanent work restrictions on plaintiff with lifting restrictions of ten pounds on an occasional basis, with no bending or twisting. Plaintiff would also need to change positions at least once per hour from a sitting position to a standing position.
31. On April 15, 2005, plaintiff returned to Dr. Rudins and reported that his pain level and frequency had been increasing. He felt he was gradually getting worse. One night he had a significant flare-up of pain, with a bad headache in the morning, prompting an emergency room visit on March 30, 2005. Plaintiff reported the pain is all focused in his lower back, and that he was attempting a regular walking program, but could not stand for long. He also said the most he can pick up is perhaps a gallon of milk. Dr. Rudins found that his pain symptoms appeared to be worse. At the hearing before the deputy commissioner, Deputy Commissioner Ledford observed that plaintiff appeared to be in genuine pain.
32. Plaintiff has very little education, having completed only the eighth grade at age 21. His work experience has involved manual labor and lifting. Since November 21, 2003, defendant has been unable or unwilling to accommodate his work restrictions. Plaintiff has not looked for work because of his pain symptoms. Given his age, education, work experience, and limitations, there would appear to be very few, if any, jobs in the competitive marketplace that he would be qualified for or could obtain.
33. Although plaintiff was rated at maximum medical improvement by January 20, 2005 and had been assigned a five percent (5%) permanent impairment for his back, Plaintiff was unable to earn wages in his former job for defendant. Defendant never provided suitable employment within his restrictions. The evidence fails to show that plaintiff was capable of earning wages in any other employment from November 21, 2003 through the present.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On August 11, 2003 plaintiff sustained an injury by accident arising out of and in the course of his employment with the defendant. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's fall on August 11, 2003 caused a compression fracture at L4 and triggered the symptoms related to the pre-existing conditions of degenerative disc disease and spinal stenosis. N.C. Gen. Stat. §97-2(6); Click v Pilot Freight Carriers, Inc., 300 N.C. 164,265 S.E. 389 (1980).
3. Defendant is responsible for payment of all medical expenses for reasonably necessary medical care for plaintiff's back injury, including the treatment rendered by Dr. Rudins, physical therapy, and all diagnostic tests. Defendant is also responsible for ongoing medical treatment for pain management. N.C. Gen. Stat. §§ 97-2(19), 97-25.
4. As a consequence of his injury by accident and resulting symptoms, plaintiff has been unable to earn wages in the same or any other employment and has been totally disabled beginning November 21, 2003 and continuing to the present. Defendant is responsible for paying plaintiff temporary total disability compensation at the rate of $ 249.80 per week for the same period. N.C. Gen. Stat. § 97-29.
5. The tagging job offered to plaintiff was modified because of his limitations and would not ordinarily be available in the competitive job market. Therefore, the proffered employment does not accurately reflect plaintiff's ability to compete with others for wages and cannot be considered evidence of earning capacity. See generally, Peoples v. ConeMills Corp., 316 N.C. 426, 342 S.E2d 798 (1986), Saums v. RaleighCommunity Hospital, 346 N.C. 760, 487 S.E.2d 746 (1997).
6. The tagging position offered plaintiff was "make work" and did not exist at defendant's business at the time it was offered, and assuming that employee did turn the job down as opposed to expressing his opinion that he was unable to do it, he was justified in doing so. Moore v.Concrete Supply Co., 118 N.C. App. at 627, 561 S.E.2d 315, 320.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay all medical expenses, including reimbursement to the plaintiff for out-of-pocket medical expenses, prescription expenses and reasonable travel to and from medical appointments which were incurred, or that may be incurred, as a result of plaintiff's compensable injuries sustained in the injury by accident of August 11, 2002, for so long as the medical treatment tends to affect a cure, give relief, or lessen the period of disability.
2. Defendant shall pay plaintiff temporary total disability compensation at the rate of $ 249.80 per week from November 21, 2003 up to and through the date of this Opinion and Award, and continuing until further Order of the Commission. All amounts that have accrued shall be paid in one lump sum, subject to the attorney's fee.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due plaintiff shall be paid to his counsel. Twenty-five percent (25%) of the lump sum due plaintiff shall be paid to plaintiff's counsel. Thereafter, every fourth check shall be paid to plaintiff's counsel.
4. Defendant shall pay the costs.
This the 13th day of November, 2006.
 S/___________________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ PAMELA T. YOUNG COMMISSIONER